UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JANE DOE (J.T.),

        Plaintiff,

v.

COLONIAL HOSPITALITY, LLC
D/B/A BEST WESTERN ORLANDO
EAST; VILLAGE INN MOTEL & RV
PARK, INC.; STARWOOD CAPITAL
GROUP MANAGEMENT, LLC
D/B/A CRESTWOOD SUITES; ESA
P PORTFOLIO L.L.C. D/B/A
CROSSLANDS ORLANDO; AVISTA
PROPERTIES XVII, LLC D/B/A
DAYS INN & SUITES ORLANDO
EAST UCF AREA, WYNDHAM
HOTEL GROUP, LLC, DAYS INNS
WORLDWIDE, INC., and
WYNDHAM HOTELS & RESORTS,
INC.

        Defendants.

CASE NO.: 6:25-cv-1629

## COMPLAINT

Plaintiff, Jane Doe (J.T.), an individual, by and through her undersigned

counsel, brings this Complaint for damages against Defendants, COLONIAL

HOSPITALITY, LLC, a Florida Limited Liability Company, d/b/a BEST

WESTERN ORLANDO EAST ("Colonial Hospitality"); VILLAGE INN MOTEL

& RV PARK, INC., a Florida Corporation, d/b/a VILLAGE INN MOTEL ("Village

Inn Motel"); STARWOOD CAPITAL GROUP MANAGEMENT, LLC, a Florida

1

Limited Liability Company, d/b/a CRESTWOOD SUITES ("Starwood Capital Group"); ESA P PORTFOLIO L.L.C. d/b/a CROSSLANDS ORLANDO ("ESA P Portfolio"); and AVISTA PROPERTIES XVII, LLC, a Florida Limited Liability Company d/b/a/ DAYS INN & SUITES BY WYNDHAM ORLANDO EAST UCF AREA ("Avista Properties"), WYNDHAM HOTEL GROUP, LLC, a Delaware Limited Liability Company, DAYS INNS WORLDWIDE, INC., a Delaware Corporation, WYNDHAM HOTELS & RESORTS, INC. a Delaware Corporation, and states as follows:

## **INTRODUCTION**

1.  This is an action against Colonial Hospitality, Village Inn Motel, Starwood Capital Group, ESA P Portfolio, and Avista Properties which each respectively knew or should have known, based on a combination of well-documented indicators, that sex trafficking and other criminal activity was occurring, and would continue to occur, on its premises as a result of their misfeasance and nonfeasance.

2.  At all material times, Colonial Hospitality, Village Inn Motel, Starwood Capital Group, ESA P Portfolio, and Avista Properties, were owned, operated, maintained and controlled by Defendants and their agents.

3.  This is also a case against Wyndham Hotel Group, LLC, Days Inn Worldwide, Inc., and Wyndham Hotels & Resorts, Inc., (the "Wyndham Brand Defendants") the franchisor entities which each respectively knew or should have known, based on a combination of well-documented indicators, monitoring, and public notices, that sex trafficking and other criminal activity was occurring, and would continue to occur, on

their franchisee's premise as a result of their misfeasance and nonfeasance.

4. At all material times, Colonial Hospitality, Village Inn Motel, Starwood Capital Group, ESA P Portfolio, Avista Properties, and the Wyndham Brand Defendants knew or should have known that sex trafficking repeatedly occurred at their respective properties. Rather than taking timely and effective measures to thwart this epidemic, these entities instead chose to engage in and profit from the open and obvious presence of sex trafficking on their property, enjoying the profit from rooms rented for this explicit and apparent purpose.

5. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, addiction, and other forms of coercion to compel individuals to engage in commercial sex acts against their will.

6. Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

7. Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of

---

[1] 18 U.S.C. § 1591; 22 U.S.C. § 7102.

sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

8.  In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or should know engages in sex trafficking.[2]

9.  As discussed herein, Defendants knowingly derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (J.T.), with minimal risk of detection or interruption. Defendants continued supporting traffickers, including Jane Doe (J.T.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

10. At all material times, the Defendant hotels and motels, through their owners, operators, and/or employees, knew or should have known that Plaintiff's trafficker(s) were using their property to harbor, provide, maintain, advertise, and facilitate the sex trafficking of Plaintiff, yet instead of rectifying these foreseeable risks, they continued to benefit from the sex trafficking that was occurring on their premises.

11. This action seeks to hold the Defendant hotels and motels accountable for knowingly benefiting from participation in a venture which they knew or should have

---

[2]  18 U.S.C. § 1595(a).

known engaged in sex trafficking in violation of 18 U.S.C. § 1595.

## PARTIES

### A. Plaintiff

12. At all material times to this complaint, Plaintiff Jane Doe (J.T.) is an adult, is a U.S. citizen, is a resident of the State of Georgia residing, and is *sui juris*.

13. All of the acts and events relevant to this Complaint occurred in this District.

14. Jane Doe (J.T.) was found to be a victim of human trafficking by a Florida Court when she was granted a human trafficking expungement.

15. Plaintiff seeks to file this action pseudonymously.

16. Plaintiff's former trafficker(s) were extremely violent, using physical abuse and threats of abuse as a means to force Plaintiff's compliance with their demands.

17. Plaintiff is using a pseudonym because of the highly personal nature of her victimization and because of the serious risk of harm to which she would be exposed by her former trafficker(s) and their criminal associates if she brought this suit in her actual name.

18. Plaintiff's right to privacy and security outweigh the public interest in knowing her identification.

19. Plaintiff's legitimate privacy and security concerns also outweigh any prejudice potentially caused to Defendants by allowing Plaintiff to proceed pseudonymously.

### Defendants

20. At all times material hereto, COLONIAL HOSPITALITY, LLC (d/b/a Best Western) was a Florida limited liability company doing business as a public lodging

establishment with its principal place of business located at 8750 E. Colonial Drive, Orlando, FL 32817 and the business was known as Best Western Orlando East.  At all times material hereto, COLONIAL HOSPITALITY, LLC owned, operated, managed, maintained, possessed, and exercised control over this premise and the hotel/motel business operating thereon.

21. At all material times hereto, VILLAGE INN MOTEL & RV PARK, INC. (d/b/a Village Inn Motel) was a Florida corporation doing business as a public lodging establishment with its principal place of business located at 17883 E Colonial Drive, Orlando, FL 32820.  At all times material hereto, VILLAGE INN MOTEL & RV PARK, INC. owned, operated, managed, maintained, possessed, and exercised control over this premise and the hotel/motel business operating thereon.

22. At all times material hereto, STARWOOD CAPITAL GROUP MANAGEMENT, LLC (d/b/a Crestwood Suites) was a Florida limited liability company doing business as a public lodging establishment offering extended stay accommodations with its principal place of business located at 11424 University Blvd, Orlando, FL 32817 and the business was known as Crestwood Suites.  At all times material hereto, STARWOOD CAPITAL GROUP MANAGEMENT, LLC owned, operated, managed, maintained, possessed, and exercised control over this premise and the extended stay business operating thereon.

23. At all times material hereto, ESA P PORTFOLIO LLC (d/b/a Crosslands) was a Florida limited liability company doing business as a public lodging establishment offering extended stay accommodations with its principal place of

6

business located at 12350 E Colonial Dr, Orlando, FL 32826 and the business was known as Crosslands.  At all times material hereto, ESA P PORTFOLIO LLC owned, operated, managed, maintained, possessed, and exercised control over this premise and the extended stay business operating thereon.

24. At all times material hereto, AVISTA PROPERTIES XVII, LLC (d/b/a Days Inn UCF Area) was a Florida limited liability company doing business as a public lodging establishment offering extended stay accommodations with its principal place of business located at 11639 E Colonial Dr, Orlando, FL 32817 and the business was known as Days Inn & Suites by Wyndham Orlando East UCF Area.  At all times material hereto, AVISTA PROPERTIES XVII, LLC owned, operated, managed, maintained, possessed, and exercised control over this premise and the hotel/motel business operating thereon.

25. At all times material hereto, WYNDHAM HOTEL GROUP, LLC ("WHG") was a for-profit Delaware company with its principal place of business in Parsippany, New Jersey.  WHG was a wholly owned subsidiary of Wyndham Worldwide Corporation.

26. At all times material hereto, DAYS INNS WORLDWIDE, INC. ("DIW") was a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. At all times relevant hereto, DIW was a subsidiary of Wyndham Hotel Group. DIW operated and franchised hotels under the Days Inn by Wyndham brand name, including Days Inn & Suites by Wyndham Orlando East UCF Area.

27. WYNDHAM HOTELS & RESORTS, INC., ("WHR") is a for-profit

Delaware corporation with its principal place of business in Parsippany, New Jersey. As of May 31, 2018, Defendant WHR is the successor entity to the hotel business of Wyndham Worldwide Corporation and its former subsidiaries, including WHG. Defendant WHR is responsible, as successor, for all liabilities of Wyndham Worldwide Corporation and its predecessor subsidiaries related to franchising, controlling, and operating the Days Inn UCF Area.

28. All references to WHR include the acts and omissions of predecessor entities for which WHR is responsible, including Wyndham Worldwide Corporation and its former subsidiaries.

29. WHR is the parent company of WHG and DIW and is a publicly held corporation.

30. WHG, WHR and DIW are referred to collectively as the "Wyndham Brand Defendants."

## JURISDICTION & VENUE

31. This Court has federal question subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, because Plaintiff brings this action under 18 U.S.C. § 1595, the TVPRA.

32. Venue is proper in this District pursuant to 28 U.S.C. § 1391b) because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendant's misconduct and omissions, occurred in the Middle District of Florida.

8

## FACTUAL ALLEGATIONS

**I. HOTEL INDUSTRY'S ROLE IN SEX TRAFFICKING AND THE DEFENDANTS' KNOWLEDGE OF THE PROBLEM**

33. It is widely known that sex trafficking largely takes place within the hotel industry.

34. Today, sex trafficking is pervasive in the United States, and hotels are the primary place where it happens.[3] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[4]

35. In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[5]

36. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

_____

[3] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council).

[4] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[5] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf.

37. As with banking regulations that are geared to dismantle and counter terrorism networks, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically starting in 2010 with the Department of Homeland Security's ("DHS") Blue Campaign.[6]  Despite the two campaigns releasing online resources and toolkits and making them publicly accessible to any entity concerned with human trafficking, the hotel industry continued to look the other way while benefitting from what they knew or should have known were commercial sex acts of a minor or of an adult and induced by force, fraud, or coercion.

38. Multiple agencies and organizations who actively combat sex trafficking, including the DHS, the National Center for Missing and Exploited Children ("NCMEC"), the Polaris Project, the Florida Attorney General, the Florida Restaurant and Lodging Association ("FRLA"), EPCAT, United Abolitionists, and others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[7]

---

[6] *DHS Blue Campaign Five Year Milestone*, Department of Homeland Security (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

[7] See, e.g., Department of Homeland Security, *Blue Campaign Toolkit,* available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Florida Restaurant and Lodging Association, *Human Trafficking Compliance*, available at: https://frla.org/human-trafficking/; Polaris Project, *Recognizing Human Trafficking*, available at: https://polarisproject.org/recognizing-human-trafficking.

39. Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, of which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

    a.  Individuals showing signs of fear, anxiety, tension, submission, and/or nervousness;

    b.  Individuals showing signs of physical abuse, restraint, and/or confinement;

    c.  Individuals exhibiting evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

    d.  Individuals showing signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

    e.  Individuals lacking freedom of movement or are constantly monitored;

    f.  Individuals avoiding eye contact and interaction with others;

    g.  Individuals having no control over or possession of money or ID;

    h.  Individuals dressing inappropriately for their age or have lower quality clothing compared to others in their party;

    i.  Individuals having few or no personal items—such as no luggage or other bags;

    j.  Individuals appearing to be with a significantly older "boyfriend" or in the company of older males;

    k.  A group of girls appearing to be traveling with a male;

l.   A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m.  Drug abuse;

n.   Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.   Possession or use of multiple cell phones; and

p.   Possession or use of large amounts of cash or pre-paid cards.[8]

40. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff.

41. Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

42. The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.  It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

43. The definition of sex trafficking in the TVPRA under 18 U.S.C.  §1591(a)(1) incorporates the definition of a commercial sex act. Defendants understood the

---

[8] *Id.*

practical and legal association between commercial sex and sex trafficking in a hotel environment.[9] Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.

44. All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

45. The most effective weapon against sexual exploitation and human trafficking is education and training.[10]  As ECPAT concluded:

> *"The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property."[11]*

46. This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel Lodging

---

[9] *Id.*

[10] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking.

[11] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training.  *See also* Caroline L. et al., *Sex Trafficking in the Tourism Industry,* J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

Association (AHLA):

> *"Hotel employees who have undergone training are more aware of*
> *trafficking when it happens – and are more willing to report it –*
> *than those who have not been trained."[12]*

47. Given the prevalence of human trafficking in hotels and the abundance
of information about how franchisors, owners, and hotel employees can identify and
respond to this trafficking, it has become apparent that the decision of a hotel chain
to continue generating revenue from traffickers without taking reasonable steps to
identify and prevent trafficking in its hotels is a decision to financially benefit by
supporting and facilitating unlawful sex trafficking.

48. Defendants' public statements regarding trafficking confirm they are aware of
the problem in the hospitality industry. Recognizing the unique vantage point that
hotel owners and staff often have to identify potential human trafficking ventures and
victims on their properties, several major hotel chains, including franchisors,
franchisees, and owner/operators, have told the public they have accepted the unique
opportunity and responsibility to stop facilitating sex trafficking. For example, the
Wyndham brand has recognized it has a "critical role in increasing awareness and
prevention" of sex trafficking in its hotels.[13] It has publicly claimed to be taking steps
to avoid facilitating sex trafficking in its hotels since at least 2011.[14] However, the
Wyndham Brand Defendants have refused to publish reports to show the brand's

---

[12] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking.

[13] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[14] *Id.*

14

progress on the EPCAT goals to combat sex trafficking in hotels.[15]

49. Each of the Defendants had a responsibility to adopt, implement, and enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

50. Unfortunately for Jane Doe J.T., the promises made by the Defendants have proven disingenuous. Defendants have each failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing sex trafficking in their hotels.  Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe J.T.

## II.    COLONIAL HOSPITALITY, LLC d/b/a BEST WESTERN ORLANDO EAST

### A. Colonial Hospitality is an Innkeeper

51. Best Western is a public lodging establishment pursuant to Chapter 509 of the Florida Statutes and an "innkeeper."

52. An innkeeper has a special relationship with its guests which gives rise to a duty to protect them against unreasonable risk of harm.

53. An innkeeper's knowledge of criminal activity on or around the grounds of its property imposes a duty to take adequate security precautions for the safety of guests and their property.

54. The relevant premises include the front office, common areas, walkways,

---

[15] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023

private rooms, designated parking areas, and curtilage.

### B. Colonial Hospitality Created an Environment that Enabled and Promoted Sex Trafficking

55. Colonial Hospitality's actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Colonial Hospitality has known, since well before Jane Doe (J.T.)'s trafficking, that sex trafficking was ongoing and widespread at its property.

56. Upon information and belief, Colonial Hospitality was aware of criminal activity occurring at its motel, including commercial sex trafficking and related crimes.

57. Upon information and belief, despite the requirements under Florida statute, Colonial Hospitality did not adequately train its staff on sex trafficking detection and prevention.

58. Upon information and belief, at all times relevant to this complaint, Colonial Hospitality did not develop or implement adequate procedures, protocols, or standards to detect and/or deter sex trafficking on its premises.

59. The Best Western was known to be located on E. Colonial Drive in a high prostitution area and was known to those engaged in commercial sex to be a location that was open to prostitution activity.

60. The Best Western was located near the onramp to SR 417, a highway.

61. The property layout had one entrance for vehicles to drive onto the property. Therefore, every separate car that drove onto the property drove past the front office

16

before they could drive around to park in front of any room, giving the front desk staff a clear view of who was entering and leaving their property and allowing the staff to avoid being unaware of any visitor on property, as is visible from this picture of the property from April 2015:



62. Colonial Hospitality knowingly rented rooms to individuals who were visibly under the influence of drugs and showed clear signs of being victims of sex trafficking.

63. Colonial Hospitality knowingly or negligently facilitated an environment where many of the hotel guests would rent rooms for the purpose of using drugs or engaging in commercial sex acts.

64. The sex trafficking problem was so apparent that the hotel reviews online even discussed the sexualized atmosphere, the prevalence of commercial sex, and the ongoing criminal activity:

> **TripAdvisor, bells990, 2015**, "Did I mention the prostitutes and pumps

(sic) who are always there?!"

**TripAdvisor, Jonathan M, 2012,** "…the rooms are filthy … I have seen 3 prostitutes already since I have been here and I have only been here for 24 hours.."

65. Colonial Hospitality was aware of the reviews because the manager or an employee responded to each review, placing them on notice of the problem, in addition to their own observations.

66. Colonial Hospitality continued to rent rooms despite obvious signs of criminal activity including drug use, excessive foot traffic to and from specific rooms, and visible evidence of trafficking.

67. Colonial Hospitality knew or should have known that Jane Doe (J.T.), her companions, and her trafficker(s), were engaged in a sex trafficking venture.

### C. The Sex Trafficking of Jane Doe (J.T.) at Best Western

68. Between 2012 - August 25, 2015, Plaintiff Jane Doe (J.T.) was trafficked at Best Western by her traffickers.

69. Plaintiff stayed at Best Western for days or weeks throughout this period off and on.

70. Upon information and belief, Best Western's staff knew Plaintiff was engaged in commercial sex work yet continued to rent rooms to her despite clear signs of trafficking.

71. During portions of her time there, she shared a room with another female who was also being trafficked by her trafficker.

18

72. Plaintiff and the other female were forced and/or coerced to engage in commercial sex acts with multiple different men per day at a continuous and ongoing interval.

73. At other times, Jane Doe (J.T.) would have a room by herself, where she was forced and/or coerced to engage in commercial sex acts with multiple different men per day at a continuous and ongoing interval.

74. Each buyer would arrive at the Best Western, park in the parking lot, walk past the front office and go to Plaintiff's room, stay for thirty (30) minutes or a similar time interval, exit the room, walk past the front office again, and depart. Plaintiff or the other female would then either walk out of the room, approach her trafficker in the parking lot, and hand him the money she made, or their trafficker would come to the room, take the money and provide drugs to the women in between each commercial sexual encounter (doubling the foot traffic to and from the room to an average of 30+ entrances and exits from the same room).

75. The Best Western knew who Jane Doe (J.T.) and the other female victim were and would intentionally and strategically give them rooms to help hide the trafficking venture. The Best Western has rooms that were on the inside of the hotel, and other rooms that were on the outside of the hotel. The hotel staff always gave Jane Doe (J.T.) and her female companion an outside facing room on the back side of the hotel to assist the traffickers and their victims in avoiding detection.

76. Jane Doe (J.T.) regularly would "walk" in front of the Best Western, meaning she would wear scantily clad attire to advertise that she was for sale and would walk

along the road, both on Best Western's property and in front of the property. Jane Doe (J.T.) would walk back and forth, sometimes for a lengthy time period, until a car would stop and the driver would "purchase" her. Jane Doe (J.T.) would then have that man park at the Best Western, she would walk past the front office and escort him up to her room, engage in commercial sex acts, and then he would leave her room, return to his vehicle, and would pass the front office as he left the property. Jane Doe (J.T.) would then leave her room and return to the front of the hotel where she would commence walking back and forth again until the next sex buyer stopped to repeat the process.

77. The Best Western's front desk had a clear view of the road in front of the hotel and the area where Jane Doe (J.T.) would "walk" to pick up dates for commercial sexual activity.

78. The area surrounding this hotel was known for heavy prostitution and drug activity and hotel management was aware of this reputation.

79. Other times, Jane Doe (J.T.) would engage in "car dates", meaning that instead of taking the sex buyer back to her room to engage in commercial sexual activity, Jane Doe (J.T.) would engage in commercial sex acts in the sex buyer's vehicle, which was parked in the Best Western parking lot.

80. Upon information and belief, the sex acts were visible to the hotel staff who were readily aware that this was taking place, but took no steps to stop the activity, so long as Jane Doe (J.T.) was paying for a room at the same time.

81. The Best Western's front desk staff knew who Jane Doe (J.T.) was and

20

recognized her.

82. There was extensive drug use in her room, to include smoking crack cocaine and methamphetamine, and injecting heroin. This drug use should have been apparent to hotel staff through smell and other indicators. Both crack and meth have a distinct and pungent odor that would be impossible to miss. Further, when heroin is boiled to prepare for injection, it also as a highly chemical, distinct odor that would be impossible to miss.

83. The room occupants were clearly high on crack, meth, and/or heroin in their behavior, actions, and mannerisms when seen around the hotel.

84. Jane Doe (J.T.) regularly appeared to be heavily under the influence of drugs while at the Best Western and was seen by both security and maintenance personnel employed by the hotel.

85. Despite the open and obvious drug use, hotel staff never intervened to tell Plaintiff or those people occupying her room to leave or stop using or smoking drugs in her room and knowingly and deliberately allowed this to continue.

86. Plaintiff was forced and/or coerced to engage in commercial sex acts by her traffickers who used physical violence and beatings, debt bondage, threats, isolation, financial control by taking all money from each commercial sex act and controlling all her money, constant surveillance, and withhold drugs as punishment to cause Plaintiff to endure severe withdrawal symptoms.

87. Best Western's staff regularly observed Plaintiff in the company of her trafficker while on property.

88. Plaintiff was always dressed in scantily clad attire to advertise the sale of sex.

89. Plaintiff frequently had visible injuries on her person from being beaten by her trafficker.

90. Plaintiff acted notably submissive to her trafficker whenever in his company, keeping her eyes down, not speaking without permission or approval, appear afraid and hypervigilant, and obeying his every command.

91. The rooms rented to Plaintiff regularly contained evidence of trafficking and drug use after they were vacated, including used condoms in trashcan, drug paraphernalia and residue on surfaces in room, used needles in room, blood spatter on walls and floors from drug use and/or violence; and the chemical odor of drugs being burned in the room and common areas.

92. Despite Plaintiff's obvious condition, hotel staff allowed her to use continental breakfast facilities without offering assistance or reporting concerns to authorities.

### III.    VILLAGE INN MOTEL

#### A. Village Inn Motel is an Innkeeper

93. Village Inn Motel is a public lodging establishment pursuant to Chapter 509 of the Florida Statutes and an "innkeeper."

94. An innkeeper has a special relationship with its guests which gives rise to a duty to protect them against unreasonable risk of harm.

95. An innkeeper's knowledge of criminal activity on or around the grounds of its property imposes a duty to take adequate security precautions for the safety of guests and their property.

22

96. The relevant premises include the front office, common areas, walkways, private rooms, designated parking areas, and curtilage.

**B. Village Inn Motel Created an Environment that Enabled and Promoted Sex Trafficking**

97. Village Inn Motel's actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Village Inn Motel has known—since well before Jane Doe J.T.'s trafficking—that sex trafficking was ongoing and widespread at its property.

98. Upon information and belief, Village Inn Motel was aware of criminal activity occurring at its motel, including commercial sex trafficking, drug activity, and related crimes.

99. Upon information and belief, despite the requirements under Florida statute, Village Inn Motel did not adequately train its staff on sex trafficking detection and prevention.

100. Upon information and belief, at all times relevant to this complaint, Village Inn Motel did not develop or implement adequate procedures, protocols, or standards to detect and/or deter sex trafficking on its premises.

101. Village Inn Motel's owners lived on-site at the property, maintaining direct oversight of all activities occurring on the premises.

102. The property layout enabled owners and staff to observe all activities, as all rooms had a direct view of the parking lot where trafficking activities regularly occurred:

23



103.     Village Inn Motel knowingly rented rooms to individuals who were visibly under the influence of drugs and showed clear signs of being victims of sex trafficking.

104.     Village Inn Motel permitted an environment where many of the occupants would rent rooms for the purpose of using drugs or engaging in commercial sex acts.

105.     Village Inn Motel continued to rent rooms despite obvious signs of criminal activity including drug use, excessive foot traffic to and from specific rooms, and visible evidence of trafficking.

**C. The Sex Trafficking of Jane Doe (J.T.) at Village Inn Motel**

106.     Between January 1, 2014 - August 25, 2015, Plaintiff Jane Doe (J.T.) was trafficked at Village Inn Motel by Traffickers.

24

107.     Plaintiff stayed at Village Inn Motel approximately multiple times per month for several days at a time continually throughout this period.

108.     Upon information and belief, Village Inn Motel's staff knew Plaintiff, knew she "belonged" to her trafficker, and knew she was engaged in commercial sex work, yet continued to rent rooms to her despite clear signs of trafficking.

109.     Plaintiff personally obtained or rented rooms in her own name while visibly under the influence of drugs.

110.     Plaintiff frequently had the man who was purchasing sex from her standing there and waiting with her while she obtained the room from the front desk for the purpose of engaging in commercial sexual activity.

111.     During each stay, Plaintiff was forced and/or coerced to engage in commercial sex acts with a steady and continuous flow of men to her room at a regular interval.

112.     Each buyer would arrive at the Village Inn Motel, park in front of Plaintiff's motel, walk inside the door of the room, stay for thirty (30) minutes or a similar time interval, exit the room, and depart.  Plaintiff would then either walk out of the room, approach her trafficker in the parking lot, and hand him the money she made, or her trafficker would come to the room, take the money and provide drugs to Plaintiff in between each commercial sexual encounter (doubling the foot traffic to and from the room).

113.     Plaintiff was forced and/or coerced to engage in commercial sex acts by trafficker(s) who used physical violence and beatings, debt bondage, threats, isolation,

25

financial control by taking all money from each commercial sex act, constant surveillance, and withhold drugs as punishment to cause Plaintiff to endure withdrawal symptoms.

114.    Village Inn Motel's staff regularly observed Plaintiff in the company of her trafficker while on property.

115.    Plaintiff was always dressed in scantily clad attire to advertise the sale of sex.

116.    Plaintiff was always visibly on drugs.

117.    Plaintiff had visible injuries to her person from being beaten by her trafficker.

118.    Plaintiff acted submissive to her trafficker whenever in his company.

119.    The rooms rented to Plaintiff regularly contained evidence of trafficking and drug use after they were vacated, including used condoms in trashcan, drug paraphernalia and residue on surfaces in room, used needles in room, blood spatter on walls and floors from drug use and/or violence; and the odor of crack cocaine in the room and common areas.

120.    Despite this, the Village Inn Motel regularly rented to Plaintiff and her trafficker again and again.

121.    Village Inn Motel's owners and staff all lived on-site at the motel, making them readily available to witness what was taking place on the premise.

122.    Despite these obvious signs of trafficking, Village Inn Motel continued to rent rooms to Plaintiff and her trafficker, directly profiting from and facilitating the

trafficking venture.

123.     Village Inn Motel took no action to prevent or report the obvious trafficking occurring on their property, instead choosing to profit from the continued and obvious rental of rooms for trafficking purposes.

## IV.    STARWOOD CAPITAL GROUP MANAGEMENT, LLC, d/b/a CRESTWOOD SUITES

### A. Starwood Capital Group is an Innkeeper

124.     Crestwood Suites is a public lodging establishment pursuant to Chapter 509 of the Florida Statutes and an "innkeeper."

125.     An innkeeper has a special relationship with its guests which gives rise to a duty to protect them against unreasonable risk of harm.

126.     An innkeeper's knowledge of criminal activity on or around the grounds of its property imposes a duty to take adequate security precautions for the safety of guests and their property.

127.     The relevant premises include the front office, common areas, walkways, private rooms, designated parking areas, and curtilage.

### B. Starwood Capital Group Created an Environment that Enabled and Promoted Sex Trafficking

128.     Starwood Capital Group's actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Starwood Capital Group has known, since well before Jane Doe (J.T.)'s trafficking, that sex trafficking

27

was ongoing and widespread at its property.

129.    Upon information and belief, Starwood Capital Group was aware of criminal activity occurring at its motel, including commercial sex trafficking and related crimes.

130.    Upon information and belief, Starwood Capital Group did not adequately train its staff on sex trafficking detection and prevention.

131.    Upon information and belief, at all times relevant to this complaint, Starwood Capital Group did not develop or implement adequate procedures, protocols, or standards to detect and/or deter sex trafficking on its premises.

132.    Crestwood Suites was known to be located in a high prostitution area and was known to those engaged in commercial sex to be a location that was open to prostitution activity.

133.    Crestwood Suites knowingly rented rooms to individuals who were visibly under the influence of drugs and showed clear signs of being victims of sex trafficking.

134.    Crestwood Suites would rent multiple rooms to the same person.

135.    Upon information and belief, Starwood Capital Group had a policy or practice of putting those engaged in commercial sex and drug use / sale on the third floor while the families stayed on the lowers levels. This practice demonstrated that hotel management was aware of and accommodated illegal activities.

136.    The sex trafficking problem was so apparent that the hotel reviews online even discussed the sexualized atmosphere, the prevalence of commercial sex, and the

ongoing criminal activity:

**Google, A.K., 2017** – "There is blood on the sheets (in two different rooms)…"

**Google, Steve H., 2015,** "…notice a HUGE blood stain on one of the pillows….its so bad i can see it through the pillow case…"

**Google, Lisa F., 2017**, "Dirty, roach infested rooms. The people that hang around there are sketchy. There are drug addicts/dealers everywhere! They've raised the prices a bit from what they used to be. Before it used to be full of hookers!"

**Google, Bobby H., 2016**, "Blood on the sheets, holes in blankets, terrible bed, slow Wi-Fi, oh and someone tried to sell me drugs in the hallway. Gangs also hang out in the parking lot."

**Google, Jake S., 2015**, "the room reeked of weed. killed some roaches. went to shower there was no shower curtain. or washcloths. got out and walked to the bed and my legs were covered in fleas. its so bad they have a cop working over night"

**Google, Pay J., 2015**, "EXTREMLY LOUD NOISES FROM ABOVE. MY RM SMELLED OF CIGARETTE SMOKE EVEN THO I WUZ IN A RM ON THE 2ND FLOOR. COULD'VE SWORN THAT I'D BEEN REPEATEDLY TOLD THAT THE 3RD FLOOR WUZ THE EMOKING FLOOR. DRUG DEN. SARCASTIC STAFF"

**Google, Torrin F., 2016**, "…Haven for criminals"

**Google, Josh R., 2016,** "Disgusting. Bugs everywhere. Criminals, drug dealers, prostitutes and drunk college kids everywhere. Stay far away."

**Google, Leslie R., 2015,** "Don't make the mistake of staying here if you value your life."

**Google, Deena A., 2017,** "Literally a drug and prostitution hotel. Stay away!"

**Google, Lisa W, 2017,** "Dump, for crackheads…"

137.    Upon information and belief, the Starwood Capital Group was aware of the reviews, placing them on notice of the problem, in addition to their own observations.

138.    The Starwood Capital Group permitted an environment where many of the occupants would rent rooms for the purpose of using drugs or engaging in commercial sex acts.

139.    The Crestwood Suites continued to rent rooms despite obvious signs of criminal activity including drug use, excessive foot traffic to and from specific rooms, and visible evidence of trafficking.

**D. The Sex Trafficking of J.T. at Crestwood Suites**

140.    Between 2014 - August 25, 2015, Jane Doe (J.T.) was trafficked at Crestwood Suites by her traffickers.

141.    Plaintiff stayed at Crestwood Suites for a few days or weeks at a time

during this period.

142.    Upon information and belief, Crestwood Suites' staff knew Plaintiff was engaged in commercial sex work yet continued to rent rooms to her despite clear signs of trafficking.

143.    To enter Crestwood Suites, the hotel has to either press a button to allow someone entry to the establishment, or Jane Doe (J.T.) would have to get a key to enter the side door to the building.

144.    Crestwood Suites had extensive security features including cameras that filmed every entrance, hallway, and staircase.

145.    During Plaintiff's trafficking at Crestwood Suites, there was high foot traffic with 5-10 people per day using the hotel entrances and immediately going to Jane Doe (J.T.)'s room, which should have been obvious to hotel staff monitoring the security cameras.

146.    Jane Doe (J.T.)'s trafficker directly bribed housekeepers and cleaning staff and handed them cash to not intervene in his criminal activities, not to interfere with his girls or his venture, and not to call the police.

147.    The hotel cleaning staff willingly accepted the bribe(s) and did not intervene or call the police.

148.    The rooms rented to Jane Doe (J.T.) regularly contained evidence of trafficking and drug use, including used condoms in trashcan, drug paraphernalia and residue on surfaces in room, used needles in plain sight, blood spatter on walls and floors from intravenous drug use and/or violence.

149.    There was extensive drug use in her room, to include smoking crack cocaine and injecting heroin.  This drug use should have been apparent to hotel staff through smell and other indicators.  Crack has a distinct and pungent odor that would be impossible to miss.  Further, when heroin is boiled to prepare for injection, it also as a highly chemical, distinct odor that would be impossible to miss.

150.    The room occupants were clearly high on crack and/or heroin in their behavior, actions, and mannerisms when seen around the hotel in common areas and when "walking" in front of Crestwood Suites.

151.    Jane Doe (J.T.) regularly appeared to be heavily under the influence of drugs while at the Crestwood Suites and was seen by hotel staff members.

152.    Despite the open and obvious drug use, hotel staff never intervened to tell Plaintiff or those people occupying her room to leave or stop using or smoking drugs in her room and knowingly and deliberately allowed this to continue.

153.    Plaintiff found a crack rock in the hallway and has seen drug paraphernalia litter the hallways and common areas, indicating that drug activity was occurring throughout the hotel premises, not just in individual rooms.

154.    Police presence at the hotel was frequent and the police were always looking for individuals with pending warrants, putting Starwood Capital Group further on notice that there were criminals staying in the hotel and criminal activity taking place.

155.    The hotel rooms were never in the trafficker's name; rather, he usually paid an addict to put the room in his name for the night and paid that person in drugs.

156.    A hotel room that has a different person paying for the room each night who appears to be heavily addicted to drugs, and having heavy male traffic in and out of that room constantly should have been a common trafficking pattern that hotel staff should have recognized.

157.    Jane Doe (J.T.) and her trafficker(s) were placed on the third floor with the others engaged in drug activity and commercial sex, demonstrating that hotel staff knew Jane Doe (J.T.) and her trafficker were engaged on commercial sex and drug activity.

158.    Jane Doe (J.T.) regularly would "walk" in front of the Crestwood Suites, meaning she would wear scantily clad attire to advertise that she was for sale and would walk along the road, both on Crestwood Suites' property and in front of the property. Jane Doe (J.T.) would walk back and forth, sometimes for a lengthy time period, until a car would stop and the driver would "purchase" her. Jane Doe (J.T.) would then have that man park at Crestwood Suites, she would walk past the front office and escort him up to her room, engage in commercial sex acts, and then he would leave her room, return to his vehicle, and would pass the front office as he left the property. Jane Doe (J.T.) would then leave her room and return to the front of the hotel where she would commence walking back and forth again until the next sex buyer stopped to repeat the process.

159.    The Crestwood Suites' front desk had a clear view of the road in front of the hotel and the area where Jane Doe (J.T.) would "walk" to pick up dates for commercial sexual activity.

160.    The area surrounding this hotel was known for heavy prostitution and drug activity and hotel management was aware of this reputation.

161.    Plaintiff acted notably submissive to her trafficker whenever in his company, keeping her eyes down, not speaking without permission or approval, appear afraid and hypervigilant, and obeying his every command.

## V.    WYNDHAM BRAND DEFENDANTS

162.    Upon information and belief, at all times relevant hereto, the Wyndham Brand Defendants have adopted a centralized approach to trafficking-related issues at all Wyndham branded properties, including the Days Inn UCF Area property.

163.    The Wyndham Brand Defendants' public statements confirm that they retained control over the response of its branded hotels to sex trafficking.

164.    In 2014, WHG publicly announced their partnership with Polaris, a leader in the global fight to eradicate human trafficking.  In response to this partnership, Bradley Miles, the CEO of Polaris stated:

> *"The hospitality industry plays a critical role in the fight against modern slavery, since many traffickers exploit their victims in hotels and motels . . . If we are to truly eradicate human trafficking, it's absolutely essential that companies like Wyndham take proactive steps to combat this crime at the root while also helping victims rebuild their lives."[16]*

165.    Geoff Ballotti, the President and CEO of WHG confirmed that WHG's partnership with Polaris gave them unique knowledge about the scope of the human

---

[16] *Wyndham Hotel Group Partners with Polaris to Help Prevent Human Trafficking,* Polaris (Nov. 14, 2014), available at: https://polarisproject.org/press-releases/wyndham-hotel-group-partners-with-polaris-to-help-prevent-human-trafficking/.

trafficking problem in their hotels, and he stated:

> *"With 7,590 hotels across 71 countries, Wyndham Hotel Group has the unique opportunity to make a meaningful and transformational impact on how the hotel industry contributes to the prevention of human trafficking. Our partnership with Polaris allows us to act upon our commitment to doing the right thing by **educating and preparing our employees and franchisees to identify and help prevent human trafficking.**"[17]*

166.    Unfortunately, while the Wyndham Brand Defendants' statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without having to make any genuine change – showing that the bottom line was more important than the moral stance of preventing human trafficking in Wyndham branded properties.[18]

167.    The problem of sex trafficking at Wyndham branded properties was so well known that, in 2011, there was a public Change.org petition with thousands of signatures to stop Wyndham hotel staff from supporting child sex trafficking. The Petition called on Wyndham to create child protection policies that were both effective and enforceable.[19]

---

[17] Id. (emphasis added).

[18] Bernice Yeung, *Should Hotel Chains Be Held Liable for Human Trafficking?*, The New Yorker (July 26, 2023), available at: https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/.

[19] *Stop Wyndham Hotel Staff from Supporting Child Sex Trafficking in Wyndham Hotels*, Change.org, (2011), available at: https://www.change.org/p/stop-wyndham-hotel-staff-

168.     This Change.org Petition was known to Wyndham, who responded to it by partnering with EPCAT-USA to sign the EPCAT Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism ("the Code").[20]

169.     Although the Wyndham Defendants publicly committed to take steps to stop facilitating trafficking, this promise proved empty; Wyndham has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[21]

170.     In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[22]

171.     The use of Days Inn motels for sex trafficking is well known to the Wyndham Brand Defendants. Information that has become public through news stories establishes the entrenched and pervasive nature of the Wyndham Brand

---

from-supporting-child-sex-trafficking-in-wyndham-hotels.

[20] *Id.*; *The Code*, ECPAT, available at: https://ecpat.org/the-code/. (The Code is a "multi-stakeholder initiative with the mission to provide awareness, tools and support to the tourism industry to prevent the sexual exploitation of children.")

[21] The 2020 Dirty Dozen List, Wyndham Hotels & Resorts, A Major Contributor to Sexual Exploitation, The National Center on Sexual Exploitation, https://endsexualexploitation.org/wyndham/.

[22] Bernice Yeung, *Should Hotel Chains Be Held Liable for Human Trafficking?*, The New Yorker (July 26, 2023), available at: https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/.

Defendants' role in providing a venue where sex trafficking has continued unabated for years. For example:

a.  In 2011, a woman was sentenced to 9 years in prison for the sex trafficking of two 14-year-old girls. The girls were forced to work at the Days Inn in Connecticut.[23]

b.  In 2012, federal officials arrested a man alleged to have trafficked a 14-year-old girl at a Days Inn in Florida.[24]

c.  In 2012, a man was convicted of trafficking a woman at a Days Inn in Wisconsin.[25]

d.  In 2012-2013, several teenage girls were sex trafficked out of a Days Inn in Pennsylvania, later resulting in a substantial settlement.[26]

e.  In 2012-2013, two teen girls were sex trafficked at a Days Inn in Nashville until rescued by the FBI. Officers set up surveillance at a Days

---

[23] East Hartford Woman Sentenced to 9 Years In Prison for Sex Trafficking Of Two 14-Year-Old Girls, Hartford Courant (June 24, 2011), https://www.courant.com/2011/06/24/east-hartford-woman-sentenced-to-9-years-in-prison-for-sex-trafficking-of-two-14-year-old-girls/.

[24] Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14, The Palm Beach Post (March 31, 2012) https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007.

[25] Shereen Siewert, Sex-trafficking cases hard to crack in Wisconsin, Post Crescent (March 25, 2014), https://www.postcrescent.com/story/news/2014/03/25/sex-trafficking-cases-hard-to-crack-in-wisconsin/6884671/.

[26] Colin McEwen, Woman Arrested for Prostitution at Days Inn (Oct. 11, 2012), https://patch.com/ohio/lakewood-oh/woman-arrested-for-prostitution-at-days-inn.

Inn in and "it did not take long for officers to observe heavy foot traffic in and out of that hotel room consistent with a prostitution operation."[27]

f.  In 2014, a girl was sex trafficked in a Days Inn in Louisiana, which included a shootout in the parking lot by the trafficker.[28]

g.  In April 2015, a Philadelphia man who worked as a security guard at a Days Inn in Philadelphia was prosecuted for assisting pimps in a sex trafficking venture at the hotel.[29]

h.  In 2015-2016, a teen girl was trafficked out of a Days Inn in Florida.[30]

172.    These articles are only a representative sample. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham branded properties. Moreover, on information and belief, the Wyndham Brand Defendants are aware of additional significant law enforcement activity related to trafficking at Wyndham branded hotels that was not reported in the media.

173.    Dozens, if not hundreds of reviews of Wyndham's branded properties across the United States and in all 50 states, which upon information and belief the

---

[27] Jack Tomczuk, Roosevelt Inn, Days Inn named in sex trafficking lawsuits (Apr. 2, 2019), https://northeasttimes.com/2019/04/02/roosevelt-inn-days-inn-named-in-sex-trafficking-lawsuits.

[28] Allen Nash, Suspect jailed in human trafficking case now faces charges in Shreveport shooting (Oct. 16, 2014), https://www.ksla.com/story/26807023/suspect-jailed-in-human-trafficking-case-now-faces-charges-in-shreveport-shooting.

[29] Philadelphia Man Sentenced for Sex Trafficking Conspiracy, FBI (April 9, 2015), https://www.fbi.gov/contact-us/field-offices/philadelphia/news/press-releases/philadelphia-man-sentenced-for-sex-trafficking-conspiracy.

[30] *S.Y. v. Naples Hotel Company, et. al.*, 476 F.Supp.3d 1251 (M.D. Fla. 2020).

Wyndham Brand Defendants monitor regularly, also show the pervasiveness of sex trafficking at its branded properties and their knowledge of the same from 2015 and prior.

174.    Upon information and belief, the Wyndham Brand Defendants monitored both news stories and online reviews for indicia of criminal activity, including sex trafficking.

175.    Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, the Wyndham Brand Defendants continued to earn revenue through conduct that they knew or should have known would continue to facilitate sex trafficking at their branded properties.

176.    Wyndham Brand Defendants' knowledge of news stories, reviews, and other public information establishes that, at the time Jane Doe (J.T.) was trafficked at one of their hotel properties, the Franchisor Defendants knew, at least, that:

    a.  There was widespread and ongoing sex trafficking occurring at their branded properties;

    b.  Sex trafficking was a brand-wide problem stemming from their top-level decisions;

    c.  Their franchisees did not have adequate policies to detect and deter sex trafficking at their brand properties;

    d.  Their franchisees were not taking reasonable steps to detect and deter known or probable sex trafficking occurring at their brand properties and were facilitating sex trafficking at the branded hotel properties;

e.  Their efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

f.  They were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

177.    Upon information and belief, the Wyndham Brand Defendants knew or should have known about widespread and ongoing trafficking activity at the hotel property because of non-public information available because they:

a.  conducted regular inspections of the hotel property;

b.  employed "field agents" to work with hotels on trafficking issues;

c.  publicly represented that it monitored and audited hotels to determine the status of anti-trafficking efforts;

d.  required franchisee and hotel staff to report suspected trafficking activity to the franchisor;

e.  was involved in day-to-day consulting on operational issues at hotel;

f.  had access to surveillance systems;

g.  collected and monitored data that showed patterns consistent with trafficking;

h.  participated in internal investigations; and

i.  solicited and received customer feedback and complaints.[31]

---

[31] Bernice Yeung, *Should Hotel Chains Be Held Liable for Human Trafficking?*, The New Yorker (July 26, 2023), available at: https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("In every case, Wyndham received the guest complaint, monitored the response, and tried to placate disgruntled guests with Wyndham

178.     Upon information and belief, the Wyndham Brand Defendants adopted a protocol that, on its face, required hotel staff and franchisees to report suspected criminal activity, including suspected prostitution and sex trafficking, to the Wyndham Brand Defendants.

179.     Despite the continually mounting evidence that sex trafficking at its properties was ongoing and growing, the Wyndham Brand Defendants earned revenue by continuing conduct that they knew or should have known would continue to facilitate that trafficking.

180.     The Wyndham Brand Defendants through DIW have allowed Avista Properties XVII, LLC to franchise the Avista Properties and entered into a franchise agreement with Avista Properties XVII, LLC.

## VI.    AVISTA PROPERTIES XVII, LLC d/b/a/ DAYS INN & SUITES BY WYNDHAM ORLANDO EAST UCF AREA

### A. Avista Properties is an Innkeeper

181.     Days Inn UCF Area is a public lodging establishment pursuant to Chapter 509 of the Florida Statutes and an "innkeeper."

182.     An innkeeper has a special relationship with its guests which gives rise to a duty to protect them against unreasonable risk of harm.

183.     An innkeeper's knowledge of criminal activity on or around the grounds of its property imposes a duty to take adequate security precautions for the safety of

_____

Rewards hotel points.").

41

guests and their property.

184.    The relevant premises include the front office, common areas, walkways, private rooms, designated parking areas, and curtilage.

### B. Avista Properties Created an Environment that Enabled and Promoted Sex Trafficking

185.    Avista Properties' actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Avista Properties has known, since well before Jane Doe (J.T.)'s trafficking, that sex trafficking was ongoing and widespread at its property.

186.    Upon information and belief, Avista Properties was aware of criminal activity occurring at its motel, including commercial sex trafficking and related crimes.

187.    Upon information and belief, Avista Properties did not adequately train its staff on sex trafficking detection and prevention.

188.    Upon information and belief, at all times relevant to this complaint, Avista Properties did not develop or implement adequate procedures, protocols, or standards to detect and/or deter sex trafficking on its premises.

189.    Days Inn UCF Area was known to be located in a high prostitution area and was known to those engaged in commercial sex to be a location that was open to prostitution activity.

190.    Days Inn UCF Area had one (1) entrance to the property which required any car entering the property to drive past the front office.  Once a car passed the front

office and circled the building, it had to drive past the front office to exit through the one (1) exit on the property.  This layout gave the front desk staff a clear view of who was entering and leaving their property and allowing the staff to avoid being unaware of any visitor on property, as is visible from this picture of the property from April 2015:



191.     Avista Properties knowingly rented rooms to individuals who were visibly under the influence of drugs and showed clear signs of being victims of sex trafficking.

192.     Days Inn UCF Area offered a continental breakfast in the morning which was full of girls that were overly thin, had visible track marks and sores from drug use, and appeared to be addicted to drugs and engaged in commercial sex.

193.     The sex trafficking problem was so apparent that the hotel reviews online even discussed the sexualized atmosphere, the prevalence of commercial sex, and the ongoing criminal activity:

**Google, David D., 2017**, "Room was in poor condition, roaches found in bed of a few rooms. Sent feedback to corporate office and never heard back."

**Google, Kymberli B., 2018**, "This is one of the worst hotels I have ever stayed at. In the middle of the night we had young people partying outside of our door and when I called the front office they told me I was lying and I was drunk. Gave me no help at all and the room was absolutely disgusting... Don't even waste a penny on this roach motel..."

**Google, Cassandra C., 2016**, "The rooms have roaches wash cloth was dirty with dirt stains and pubic hair on it.."

**Google, Melissa C., 2016**, "This hotel is disgusting. My husband stayed here for a week for work. He said there were prostitutes walking around trying to sell themselves and drugs. Will never stay there again. GROSS"

**Google, Sandra R., 2015**, " The room we reserved was supposed to be non-smoking but reeked of smoke. After complaining to the front desk (John) that we have allergies to smoke, the attendant said he could do nothing but offer a spray that 'might make the room smell better'"

**Google, Dave C., 2012**, "DO NOT MAKE A RESERVATION HERE!! The owner post some pictures of the parking lot at night, with the gang and the crackheads hanging out. Days Inn Corporate should remove their name from this dump. I made a reservation here, went to the front desk and checked in, then drove around the corner to where my room was. I feared

for my life, went right back to the desk and said no way in hell am I staying here, I want my $$ back. Next day a charge for 2 nights appeared on my card. Finally got one night refunded, couldn't get the other one back because I made a reservation."

**TripAdvisor, Jeanine F, 2017**, "Nothing about this place was good. Filthy. Bed mattress was gross and stained. Drug deals happening outside of our room. Loud yelling all night long. Felt VERY unsafe! The breakfast was a joke. This hotel should be demolished. Never ever again."

**TripAdvisor, Aprils218, 2016**, "Room smelled really bad. And let's talk about all of the drug activity! And employees (cleaners mainly) associating with them and making jokes loud enough about their "addictions" won't ever go back and hate that my family couldn't sleep cause of the amount of traffic in and out and loudness of people outside drinking and openly doing drugs. Needles right outside on the ground by stairs!!!!"

**TripAdvisor, Qtpie91, 2014**, "I was so embarrassed! When sending my friends and family here. I went to help them unload and check in. Everyone mouth dropped to the floor. My friend even said the room looked like a crime scene. It was just that bad!"

194.    Avista Properties was aware of the reviews because the manager or an employee responded to each review, placing them on notice of the problem, in addition to their own observations.

195.    Further, upon information and belief, the Wyndham Brand Defendants

45

were specifically aware that sex trafficking was widespread and ongoing on the Days Inn.

196.    Days Inn UCF Area permitted an environment where many of the occupants would rent rooms for the purpose of using drugs or engaging in commercial sex acts.

197.    Days Inn UCF Area continued to rent rooms despite obvious signs of criminal activity including drug use, excessive foot traffic to and from specific rooms, and visible evidence of trafficking.

### C. The Sex Trafficking of Jane Doe (J.T.) at Days Inn UCF Area

198.    Between the end of 2014 - August 25, 2015, Jane Doe (J.T.) was trafficked at Days Inn UCF Area by her traffickers.

199.    Plaintiff stayed at Days Inn UCF Area for a few weeks during this period.

200.    Upon information and belief, Days Inn UCF Area staff knew Plaintiff was engaged in commercial sex work yet continued to rent rooms to her despite clear signs of trafficking.

201.    A hotel room that has a different person paying for the room each night who appears to be heavily addicted to drugs and having heavy male traffic in and out of that room constantly should have been a common trafficking pattern that hotel staff should have recognized.

202.    Nonetheless, Days Inn UCF Area frequently had the room Jane Doe (J.T.) was forced to working out of was paid for by different addicts throughout their

stay without any concern or questions from the hotel.

203.     Despite Plaintiff's obvious condition showing signs of drug addiction and abuse, Plaintiff and her trafficker would be visible together to the staff when they would eat the continental breakfast.  Like many of the girls at the continental breakfast, Jane Doe (J.T.) was overly skinny, had visible track marks and sores, and often was high on drugs.

204.     Plaintiff acted notably submissive to her trafficker whenever in his company, keeping her eyes down, not speaking without permission or approval, appear afraid and hypervigilant, and obeying his every command.

205.     Jane Doe (J.T.)'s trafficker refused to allow housekeeping to clean the rooms, which should have been a red flag to hotel management about potentially illegal activities occurring in the rooms.

206.     Days Inn UCF Area had a reputation as a hotel that allowed commercial sex and drug activity to occur without interference.

207.     During September/October 2015, while Plaintiff was being trafficked at the property, she had an active warrant, yet hotel staff continued to allow her presence without reporting suspicious activity to authorities.

208.     Based upon information and belief, multiple employees at the Days Inn UCF Area, including management-level employees, observed, or were made aware of these obvious signs of Jane Doe (J.T.)'s trafficking while acting within the scope and course of their employment. Based on this and on the above-listed methods that it used to monitor and supervise the Days Inn UCF Area, the Avista Properties knew

47

or were willfully blind to the fact that Jane Doe was being trafficked.

209.    Given these obvious signs, the Wyndham Brand Defendants knew or should have known about the trafficking of Jane Doe (J.T.) based on its policy or protocol that required hotel staff to report suspected trafficking.

210.    The Wyndham Brand Defendants also knew or should have known about Jane Doe (J.T.)'s trafficking based on the methods that it used to monitor and supervise the Days Inn UCF Area.

211.    The Wyndham Brand Defendants and Avista Properties had constructive knowledge of the trafficking of Jane Doe (J.T.) at Days Inn UCF Area because that trafficking was the direct result of the Wyndham Brand Defendants and Avista Properties facilitating trafficking at Days Inn UCF Area.

### D. Wyndham Facilitated the Trafficking Activity at Days Inn UCF Area & Participated in a Venture

212.    Wyndham directly participated in and retained day-to-day control over renting rooms at the Days Inn UCF Area by, among other things:

    a.  controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

    b.  controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification;

c. requiring the franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

d. reserving rooms and accept payments without requiring franchisee approval or involvement;

e. controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation;

f. requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

g. requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

h. requiring the franchisee to use a property-management system operated and controlled by the franchisor;

i. requiring the franchisee to use a data-management system operated and controlled by the franchisor;

j. ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

k. exercising control over the price of rooms;

l. controlling all details of the customer loyalty program that the franchisee was required to implement;

m. setting detailed policies for the check-in process, including requirements for identification and payment methods;

n. collecting guest data, requiring franchisees to report guest data, and

49

reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

o. assuming sole ownership over all guest information;

p. granting authorization to use the Days Inn trademark; and

q. overseeing the "Do Not Rent" (DNR) lists for its branded properties.

213. Wyndham directly participated in and retained control over aspects of the operation of Days Inn UCF Area related to trafficking by:

a. Arranging for digital photographs to be taken of the facility by a Wyndham preferred photography company for public use to advertise the establishment and mask any on-site concerns;

b. assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

c. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the franchisor;

d. assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

e. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

f. employing field-based associates who work with hotels on trafficking

50

issues;

g. assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

h. establishing systems for guests to report security issues to franchisor;

i. requiring franchisees to provide Wi-Fi/internet access to guests;

j. mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

k. setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

l. requiring franchisees to use a system to monitor and track housekeeping requests;

m. setting policies for when and how housekeeping services are provided;

n. collecting and monitoring data that shows patterns of use of housekeeping services; and

o. setting policies for when and how hotel staff can accept tips.

214. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Days Inn UCF Area, the Wyndham Brand Defendants continued renting rooms to the traffickers and sex buyers with Jane Doe (J.T.).

215. The Wyndham Brand Defendants knew or should have known that Jane Doe (J.T.) was being trafficked and, despite this, benefited from continued association

with her trafficker(s) by providing them hotel rooms and related services to facilitate Jane Doe (J.T.)'s sexual exploitation.

216.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Days Inn UCF Area, the Wyndham Brand Defendants in coordination with Avista Properties, continued operating the Days Inn UCF Area in a way that it knew or should have known would result in facilitating additional sex trafficking at Days Inn UCF Area, including by:

a.  adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing Jane Doe (J.T.)'s trafficker(s) to get rooms for prolonged time periods without registering their own name on the room and instead allowing drug addicts and sex buyers to put the room in a different man's name each night;

b.  adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers and their victims, including Jane Doe (J.T.), to pay for rooms using non-traceable methods and on a daily basis;

c.  adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d.  providing traffickers continued access to Franchisor-maintained internet systems despite having active or constructive knowledge this access was

being used for advertising services related to their trafficking activities on websites such as Backpage.com;

e. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Avista Properties and hotel staff related to human trafficking at Days Inn UCF Area; and

f. implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

217. If the Wyndham Brand Defendants had exercised reasonable diligence when operating the Days Inn UCF Area, the Wyndham Brand Defendants would have prevented the Days Inn UCF Area from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (J.T.). Instead, the Wyndham Brand Defendants engaged in a course of conduct that affirmatively facilitated widespread and ongoing sex trafficking in coordination with the franchisee, including the trafficking of Jane Doe (J.T.).

218. The Wyndham Brand Defendants, as well as Avista Properties directly benefited from facilitating trafficking at the Days Inn UCF Area.

219. Each of the Wyndham Brand Defendants generated substantial income from operations of hotels such as the Days Inn UCF Area. In exchange for providing the services described above and more specifically delineated in the controlling

franchise agreement, the Wyndham Brand Defendants received a share of the profits from room rentals collected at the Days Inn UCF Area. The fees generated by the Wyndham Brand Defendants are primarily based on gross room rentals; therefore, the Wyndham Brand Defendants' profits increase with each room rental at the Days Inn UCF Area.

### E. Avista Properties is an agent of Wyndham Brand Defendants

220.     The Wyndham Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Avista Properties, which are the Wyndham Brand Defendants' actual agents or subagents.

221.     The Wyndham Brand Defendants subjected Avista Properties to detailed standards and requirements regarding the operation of Days Inn UCF Area through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Brand Defendants. These written standards, protocols, and requirements:

  a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Avista Properties used at Days Inn UCF Area; and

  b. covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

      c.  dictated the specific manner in which Avista Properties and hotel staff must carry out most day-to-day functions at Days Inn UCF Area; and

      d.  significantly exceeded what was necessary for the Wyndham Brand Defendants to protect their registered trademarks.

222.    The Wyndham Brand Defendants maintained control over Avista Properties' day-to-day operation of Days Inn UCF Area through:

      a.  The Wyndham Brand Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Wyndham Brand Defendants to protect their registered trademarks;

      b.  The Wyndham Brand Defendants maintained a team of regionally based trainers to provide training at branded hotels;

      c.  The Wyndham Brand Defendants provided hotels staff with training it created through an online learning platform, Wyndham University, they controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

      d.  The Wyndham Brand Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training

methods used;

e.  The Wyndham Brand Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f.  The Wyndham Brand Defendants maintained oversight in hiring, disciplining, and terminating hotel management and employees;

g.  The Wyndham Brand Defendants required franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

h.  The Wyndham Brand Defendants required franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at through the hotel through direct access to the system;

i.  The Wyndham Brand Defendants set required staffing levels for their franchisees;

j.  The Wyndham Brand Defendants established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

k.  The Wyndham Brand Defendants set requirements for the hiring process used by franchisees;

l.  The Wyndham Brand Defendants oversaw employee discipline processes and termination decisions;

m. The Wyndham Brand Defendants controlled channels for guests to

report complaints or provide feedback regarding their stay at a Days Inn and directly participated in the response and/or supervised and the response to customer complaints or other feedback. Wyndham retained the right to provide refunds or other compensation to guests and to require Avista Properties to pay associated costs;

n.  The Wyndham Brand Defendants maintained and analyzed the guest complaints and online reviews for the Days Inn UCF Area;

o.  The Wyndham Brand Defendants set detailed requirements for insurance that Avista Properties must purchase;

p.  The Wyndham Brand Defendants regularly audited the books and records of Avista Properties;

q.  The Wyndham Brand Defendants controlled all marketing for the Days Inn UCF Area, directly provided marketing services, photographs, and prohibited Avista Properties from maintaining any online presence unless specifically reviewed and approved by Wyndham; and

r.  The Wyndham Brand Defendants exercised or retained control over all aspects of building and facility design.

## VII.  ESA P PORTFOLIO L.L.C. d/b/a CROSSLANDS ORLANDO

### A. ESA P Portfolio is an Innkeeper

223.    Crosslands is a public lodging establishment pursuant to Chapter 509 of the Florida Statutes and an "innkeeper."

224.    An innkeeper has a special relationship with its guests which gives rise

to a duty to protect them against unreasonable risk of harm.

225.    An innkeeper's knowledge of criminal activity on or around the grounds of its property imposes a duty to take adequate security precautions for the safety of guests and their property.

226.    The relevant premises include the front office, common areas, walkways, private rooms, designated parking areas, and curtilage.

## B. ESA P Portfolio Created an Environment that Enabled and Promoted Sex Trafficking

227.    ESA P Portfolio's actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. ESA P Portfolio has known, since well before Jane Doe (J.T.)'s trafficking, that sex trafficking was ongoing and widespread at its property.

228.    Upon information and belief, ESA P Portfolio was aware of criminal activity occurring at its motel, including commercial sex trafficking and related crimes.

229.    Upon information and belief, ESA P Portfolio did not adequately train its staff on sex trafficking detection and prevention.

230.    Upon information and belief, at all times relevant to this complaint, ESA P Portfolio did not develop or implement adequate procedures, protocols, or standards to detect and/or deter sex trafficking on its premises.

231.    Crosslands was known to be located in a high prostitution area and was known to those engaged in commercial sex to be a location that was open to

prostitution activity.

232.    ESA P Portfolio knowingly rented rooms to individuals who were visibly under the influence of drugs and showed clear signs of being victims of sex trafficking.

233.    ESA P Portfolio permitted an environment where many of the occupants would rent rooms for the purpose of using drugs or engaging in commercial sex acts.

234.    ESA P Portfolio continued to rent rooms despite obvious signs of criminal activity including drug use, excessive foot traffic to and from specific rooms, and visible evidence of trafficking.

**F.  The Sex Trafficking of Plaintiff at Crosslands**

235.    During the end of 2014 – August 25, 2015, Plaintiff was trafficked at Crosslands.

236.    Plaintiff and her trafficker(s) stayed at Crosslands for multiple weeks at a time during this period.

237.    Upon information and belief, Crosslands' staff knew Plaintiff was engaged in commercial sex work yet continued to rent rooms to her despite clear signs of trafficking.

238.    The hotel had a known reputation for prostitution and drug activity that management was aware of but failed to address.

239.    Indeed, Plaintiff's traffickers repeatedly chose to use Crosslands for their sex trafficking activity. They selected this hotel because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. Apparent indicia of widespread and ongoing sex trafficking

at Crosslands, consistent with the well-known "red flags" for sex trafficking in the hospitality industry.

240.     There was a frequent and continuous flow of males, who were not guests of the hotel, in and out of the room that Plaintiff occupied after brief stays.

241.     There was widespread drug trade at the hotel, which is closely linked to human trafficking.

242.     Drug activity and sales were open and visible, occurring in the common areas of the hotel, which were visible.

243.     The common areas frequently smelled like marijuana or other odors associated with drug activity.

244.     Housekeeping services were not offered, providing traffickers with more anonymity and which allowed trafficking activities to continue undetected in rooms.

245.     The rooms occupied by Jane Doe (J.T.) and her trafficker(s) regularly contained evidence of trafficking and drug use, including used condoms in trashcan, drug paraphernalia and residue on surfaces in room, used needles in plain sight, blood spatter on walls and floors from intravenous drug use and/or violence.

246.     There was extensive drug use in her room, to include smoking crack cocaine and injecting heroin.  This drug use should have been apparent to hotel staff through smell and other indicators.  Crack has a distinct and pungent odor that would be impossible to miss.  Further, when heroin is boiled to prepare for injection, it also as a highly chemical, distinct odor that would be impossible to miss.

247.     The room occupants, including Jane Doe (J.T.) were clearly high on

crack and/or heroin in their behavior, actions, and mannerisms when seen around the hotel in common areas and when "walking" in front of Crosslands.

248.    J.T. regularly appeared to be heavily under the influence of drugs while at the Crosslands and was seen by hotel staff members.

249.    Despite the open and obvious drug use, hotel staff never intervened to tell Plaintiff or those people occupying her room to leave or stop using or smoking drugs in her room and knowingly and deliberately allowed this to continue.

250.    Jane Doe (J.T.) and her trafficker(s) were placed in the "back" of the hotel with the others engaged in drug activity and commercial sex, demonstrating that hotel staff knew Jane Doe (J.T.) and her trafficker were engaged on commercial sex and drug activity.

251.    Jane Doe (J.T.) regularly would "walk" in front of the Crosslands, meaning she would wear scantily clad attire to advertise that she was for sale and would walk along the road, both on Crosslands' property and in front of the property. Jane Doe (J.T.) would walk back and forth, sometimes for a lengthy time period, until a car would stop and the driver would "purchase" her.  Jane Doe (J.T.) would then have that man park at Crosslands, she would walk past the front office and escort him up to her room, engage in commercial sex acts, and then he would leave her room, return to his vehicle, and would pass the front office as he left the property.  Jane Doe (J.T.) would then leave her room and return to the front of the hotel where she would commence walking back and forth again until the next sex buyer stopped to repeat the process.

252.     The Crosslands' front desk had a clear view of the road in front of the hotel and the area where Jane Doe (J.T.) would "walk" to pick up dates for commercial sexual activity.

253.     The area surrounding this hotel was known for heavy prostitution and drug activity and hotel management was aware of this reputation.

254.     The hotel rooms were never in the trafficker's name; rather, he usually paid an addict to put the room in his name for the night and paid that person in drugs.

255.     A hotel room that has a different person paying for the room each night who appears to be heavily addicted to drugs, and having heavy male traffic in and out of that room constantly should have been a common trafficking pattern that hotel staff should have recognized.

## VIII.  PHYSICAL AND PSYCHOLOGICAL HARM TO PLAINTIFF

256.     As a direct result of the trafficking that occurred at Defendants' properties, Plaintiff suffered severe and lasting physical injuries including multiple MRSA and staph infections requiring hospitalization.

257.     These infections resulted in permanent physical scarring across Plaintiff's hands, face, body, arms, legs, and neck, serving as permanent reminders of her victimization.

258.     Plaintiff contracted Hepatitis C while being trafficked, requiring over a decade of medical treatment.

259.     The psychological trauma inflicted upon Plaintiff during her trafficking at Defendants' properties resulted in severe and ongoing mental health conditions

including severe anxiety disorder, complex trauma, dissociative disorder, and ADHD formed from trauma response.

260.    Plaintiff continues to suffer from recurring nightmares, dissociation during confrontational situations, and severe geographic limitations including inability to drive through Orlando or use certain public facilities.

261.    The trauma has impacted Plaintiff's ability to form and maintain relationships, including affecting her current marriage through trauma-induced dissociative episodes.

262.    Plaintiff required intensive rehabilitation from April 2018 through November 2020, including residential treatment and transitional living support, to recover from the trauma inflicted during her trafficking.

263.    Despite some improvement through intensive treatment, Plaintiff is permanently harmed and will continue to suffer these harms for the remainder of her natural life.

## IX.    EQUITABLE TOLLING OF CLAIMS

264.    Defendants continue to operate hotel properties where they profit from what they knew or should have known was sex trafficking and related illicit activity.

265.    Defendants acted with impunity, continuing to collect profits and benefits from sex trafficking activities while failing to implement proper policies or training to prevent such activities.

266.    Plaintiff was prevented from pursuing her claims prior to August 25, 2015 due to the coercive control exercised by her traffickers and the continuing effects

63

of severe trauma.

267.    Plaintiff was trafficked at Defendants' properties during 2012 through August 25, 2015, and due to each of the Defendants' negligence and willful blindness, she remained trapped and enslaved to her trafficker.

268.    Plaintiff's trafficker(s) use of force, fraud, and coercion to maintain total control over Plaintiff and prevented her from having the freedom or capacity for independent thought or action necessary to pursue legal remedies.

269.    While Plaintiff was a victim of trafficking, reporting what occurred, speaking to a lawyer, or pursuing a lawsuit were not possible, especially when many law enforcement authorities often treated trafficking victims (including Plaintiff) as criminals rather than victims.

270.    Plaintiff's traffickers were master manipulators and were extremely violent.

271.    Plaintiff's traffickers threatened her life and physical harm if she even considered reporting her abuse, keeping her trapped, addicted, and terrified. Plaintiff's traffickers convinced her that if she even formed the thought, they would know and punish her severely for it.

272.    The Defendants only increased and perpetuated Plaintiff's fear because they chose to ignore the obvious signs of her victimization and instead decided to make money and share in the profit made from her abuse and exploitation.

273.    The severe psychological trauma inflicted upon Plaintiff during her trafficking, including complex post-traumatic stress disorder, dissociative disorder,

and severe anxiety, impaired her ability to understand her legal rights or pursue remedies.

274.　　Plaintiff sought to bring these claims as soon as reasonably possible after escaping trafficking, completing her recovery program, and gaining the psychological stability necessary to pursue legal action.

275.　　The equitable tolling doctrine and discovery rule applies to Plaintiff's claims due to the extraordinary circumstances of her trafficking victimization and the continuing effects of trauma that prevented her from earlier asserting her rights.

<u>**CAUSES OF ACTION**</u>

**COUNT I**
**BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. § 1595**
*(JANE DOE (J.T.) v. VILLAGE INN MOTEL)*

276.　　Plaintiff Jane Doe (J.T.) realleges and incorporates by reference the allegations contained in paragraphs 1-50, 93-123, 256-275, as if fully set forth in this Count.

277.　　Defendant Village Inn Motel knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(2) and 1595(a), occurring within the territorial jurisdiction of the United States.

278.　　Defendant Village Inn Motel's conduct was in or affected interstate and/or foreign commerce.

279.　　Plaintiff is a human trafficking victim.

280.     Plaintiff's trafficker recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, and/or solicited Plaintiff.

281.     Plaintiff was engaging in commercial sex acts at Village Inn Motel through force, threats of force, and coercion.

282.     Plaintiff was regularly beaten by her trafficker and was covered in visible bruises on her body while at the Village Inn Motel.

283.     Plaintiff's trafficker used her drug addiction and the threat of causing her harm by becoming "dope sick" to threaten and coerce her to engage in commercial sex acts.

284.     All money made by Plaintiff from these commercial sex acts was given to her trafficker.

285.     Plaintiff's trafficker and the Village Inn Motel took part in a common undertaking or enterprise involving both risk and potential profit wherein her trafficker ran a criminal sex trafficking and drug dealing operation out of the Village Inn Motel and both Plaintiff's trafficker and the Village Inn Motel financially benefited from the same.

286.     Defendant Village Inn Motel received something of value by making money from the room rentals that were being paid.

287.     Plaintiff's trafficker received something of value in that they received the proceeds of Plaintiff's commercial sex acts, as well as he received a "safe" venue to operate his criminal venture without the risk of the Village Inn Motel calling the police.

288.     Plaintiff received drugs so that she did not become sick from withdrawal symptoms as compensation for engaging in sex acts.

289.     Defendant Village Inn Motel knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 1591(a)(1).

290.     Defendant Village Inn Motel rented rooms as needed for commercial sex and they did not call the police on Plaintiff's trafficker so as not to get in the way of his "business," and continued to reap the profits of this criminal venture.

291.     Defendant Village Inn Motel's conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, financial, and reputational harm.

WHEREFORE, Plaintiff Jane Doe (J.T.) demands judgment from Defendant Village Inn Motel, for compensatory damages for past and future damages, reasonable attorney's fees, costs and expenses of these proceedings, and such other relief as this Court deems just and proper.

## COUNT II
## BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. § 1595
### *(JANE DOE (J.T.) v. COLONIAL HOSPITALITY)*

292.     Plaintiff Jane Doe (J.T.) realleges and incorporates by reference the allegations contained in paragraphs 1-92, 256-275, as if fully set forth in this Count.

293.     Defendant Colonial Hospitality knowingly used the instrumentalities

and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(2) and 1595(a), occurring within the territorial jurisdiction of the United States.

294.    Defendant Colonial Hospitality's conduct was in or affected interstate and/or foreign commerce.

295.    Plaintiff is a human trafficking victim.

296.    Plaintiff's trafficker recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, and/or solicited Plaintiff.

297.    Plaintiff was engaging in commercial sex acts at Best Western through force, threats of force, and coercion.

298.    Plaintiff was regularly beaten by her trafficker and was covered in visible bruises on her body while at the Best Western.

299.    Plaintiff's trafficker used her drug addiction and the threat of causing her harm by becoming "dope sick" to threaten and coerce her to engage in commercial sex acts.

300.    All money made by Plaintiff from these commercial sex acts was given to her trafficker.

301.    Plaintiff's trafficker and Colonial Hospitality took part in a common undertaking or enterprise involving both risk and potential profit wherein her trafficker ran a criminal sex trafficking and drug dealing operation out of the Best Western and both Plaintiff's trafficker and the Colonial Hospitality financially benefited from the same.

68

302.    Defendant Colonial Hospitality received something of value by making money from the room rentals that were being paid.

303.    Plaintiff's trafficker received something of value in that they received the proceeds of Plaintiff's commercial sex acts, as well as he received a "safe" venue to operate his criminal venture without the risk of the Best Western calling the police.

304.    Plaintiff received drugs so that she did not become sick from withdrawal symptoms as compensation for engaging in sex acts.

305.    Defendant Colonial Hospitality knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 1591(a)(1).

306.    Defendant Colonial Hospitality rented rooms as needed for commercial sex and they did not call the police on Plaintiff's trafficker so as not to get in the way of his "business," and continued to reap the profits of this criminal venture.

307.    Defendant Colonial Hospitality's conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, financial, and reputational harm.

WHEREFORE, Plaintiff Jane Doe (J.T.) demands judgment from Defendant Colonial Hospitality, for compensatory damages for past and future damages, reasonable attorney's fees, costs and expenses of these proceedings, and such other relief as this Court deems just and proper.

## COUNT III
## BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. § 1595
### *(JANE DOE (J.T.) v. STARWOOD CAPITAL GROUP)*

308.     Plaintiff Jane Doe (J.T.) realleges and incorporates by reference the allegations contained in paragraphs 1-50, 124-161, 256-275, as if fully set forth in this Count.

309.     Defendant Starwood Capital Group knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(2) and 1595(a), occurring within the territorial jurisdiction of the United States.

310.     Defendant Starwood Capital Group's conduct was in or affected interstate and/or foreign commerce.

311.     Plaintiff is a human trafficking victim.

312.     Plaintiff's trafficker recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, and/or solicited Plaintiff.

313.     Plaintiff was engaging in commercial sex acts at Crestwood Suites through force, threats of force, and coercion.

314.     Plaintiff was regularly beaten by her trafficker and was covered in visible bruises on her body while at the Crestwood Suites.

315.     Plaintiff's trafficker used her drug addiction and the threat of causing her harm by becoming "dope sick" to threaten and coerce her to engage in commercial sex acts.

316.    All money made by Plaintiff from these commercial sex acts was given to her trafficker.

317.    Plaintiff's trafficker and Starwood Capital Group took part in a common undertaking or enterprise involving both risk and potential profit wherein her trafficker ran a criminal sex trafficking and drug dealing operation out of the Crestwood Suites and both Plaintiff's trafficker and Starwood Capital Group financially benefited from the same.

318.    Defendant Starwood Capital Group received something of value by making money from the room rentals that were being paid.

319.    Plaintiff's trafficker received something of value in that they received the proceeds of Plaintiff's commercial sex acts, as well as he received a "safe" venue to operate his criminal venture without the risk of the Crestwood Suites calling the police.

320.    Plaintiff received drugs so that she did not become sick from withdrawal symptoms as compensation for engaging in sex acts.

321.    Defendant Starwood Capital Group knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 1591(a)(1).

322.    The Crestwood Suites rented rooms as needed for commercial sex and they did not call the police on Plaintiff's trafficker so as not to get in the way of his "business," and continued to reap the profits of this criminal venture.

323.    Defendant Starwood Capital Group's conduct has caused Plaintiff

serious harm including, without limitation, physical, psychological, financial, and reputational harm.

WHEREFORE, Plaintiff Jane Doe (J.T.) demands judgment from Defendant Starwood Capital Group, for compensatory damages for past and future damages, reasonable attorney's fees, costs and expenses of these proceedings, and such other relief as this Court deems just and proper.

## COUNT IV
### BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. § 1595
*(JANE DOE (J.T.) v. ESA P PORTFOLIO)*

324.     Plaintiff Jane Doe (J.T.) realleges and incorporates by reference the allegations contained in paragraphs 1-50, 223-275, as if fully set forth in this Count.

325.     Defendant ESA P Portfolio knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(2) and 1595(a), occurring within the territorial jurisdiction of the United States.

326.     Defendant ESA P Portfolio's conduct was in or affected interstate and/or foreign commerce.

327.     Plaintiff is a human trafficking victim.

328.     Plaintiff's trafficker recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, and/or solicited Plaintiff.

329.     Plaintiff was engaging in commercial sex acts at ESA P Portfolio through force, threats of force, and coercion.

330.     Plaintiff was regularly beaten by her trafficker and was covered in visible bruises on her body while at the Crosslands.

331.     Plaintiff's trafficker used her drug addiction and the threat of causing her harm by becoming "dope sick" to threaten and coerce her to engage in commercial sex acts.

332.     All money made by Plaintiff from these commercial sex acts was given to her trafficker.

333.     Plaintiff's trafficker and ESA P Portfolio took part in a common undertaking or enterprise involving both risk and potential profit wherein her trafficker ran a criminal sex trafficking and drug dealing operation out of the Crosslands and both Plaintiff's trafficker and ESA P Portfolio financially benefited from the same.

334.     Defendant ESA P Portfolio received something of value by making money from the room rentals that were being paid.

335.     Plaintiff's trafficker received something of value in that they received the proceeds of Plaintiff's commercial sex acts, as well as he received a "safe" venue to operate his criminal venture without the risk of the Crosslands calling the police.

336.     Plaintiff received drugs so that she did not become sick from withdrawal symptoms as compensation for engaging in sex acts.

337.     Defendant ESA P Portfolio knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 1591(a)(1).

338.     Defendant ESA P Portfolio rented rooms as needed for commercial sex and they did not call the police on Plaintiff's trafficker so as not to get in the way of his "business," and continued to reap the profits of this criminal venture.

339.     Defendant ESA P Portfolio's conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, financial, and reputational harm.

WHEREFORE, Plaintiff Jane Doe (J.T.) demands judgment from Defendant ESA P Portfolio, for compensatory damages for past and future damages, reasonable attorney's fees, costs and expenses of these proceedings, and such other relief as this Court deems just and proper.

## COUNT V
### BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. § 1595
*(JANE DOE (J.T.) v. AVISTA PROPERTIES & THE WYNDHAM BRAND DEFENDANTS)*

340.     Plaintiff Jane Doe (J.T.) realleges and incorporates by reference the allegations contained in paragraphs 1-50, 162-222, 256-275, as if fully set forth in this Count.

341.     Defendant Avista Properties knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(2) and 1595(a), occurring within the territorial jurisdiction of the United States.

342.     Defendant Avista Properties' conduct was in or affected interstate

74

and/or foreign commerce.

343.    The Wyndham Brand Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(2) and 1595(a), occurring within the territorial jurisdiction of the United States.

344.    The Wyndham Brand Defendants' conduct was in or affected interstate and/or foreign commerce.

345.    Plaintiff is a human trafficking victim.

346.    Plaintiff's trafficker recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, and/or solicited Plaintiff.

347.    Plaintiff was engaging in commercial sex acts at Days Inn UCF Area through force, threats of force, and coercion.

348.    Plaintiff was regularly beaten by her trafficker and was covered in visible bruises on her body while at the Days Inn UCF Area.

349.    Plaintiff's trafficker used her drug addiction and the threat of causing her harm by becoming "dope sick" to threaten and coerce her to engage in commercial sex acts.

350.    All money made by Plaintiff from these commercial sex acts was given to her trafficker.

351.    Plaintiff's trafficker, the Wyndham Brand Defendants, and the Avista Properties took part in a common undertaking or enterprise involving both risk and potential profit wherein her trafficker ran a criminal sex trafficking and drug dealing

operation out of the Days Inn UCF Area and both Plaintiff's trafficker and the Days Inn UCF Area financially benefited from the same.

352.    Defendant Avista Properties received something of value by making money from the room rentals that were being paid.

353.    Wyndham Brand Defendants received something of value by making money from the room rentals that were being paid.

354.    Plaintiff's trafficker received something of value in that they received the proceeds of Plaintiff's commercial sex acts, as well as he received a "safe" venue to operate his criminal venture without the risk of the Days Inn UCF Area calling the police.

355.    Plaintiff received drugs so that she did not become sick from withdrawal symptoms as compensation for engaging in sex acts.

356.    Defendant Avista Properties knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 1591(a)(1).

357.    Defendant Avista Properties and the Wyndham Brand Defendants rented rooms as needed for commercial sex and they did not call the police on Plaintiff's trafficker so as not to get in the way of his "business," and continued to reap the profits of this criminal venture.

358.    Defendant Avista Properties' conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, financial, and reputational harm.

WHEREFORE, Plaintiff Jane Doe (J.T.) demands judgment from Defendant Avista Properties and the Wyndham Brand Defendants, for compensatory damages for past and future damages, reasonable attorney's fees, costs and expenses of these proceedings, and such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable pursuant to Fed. R. Civ. P. 38.

Date: <u>August 25, 2025</u>                              Respectfully Submitted,

**Lisa D. Haba** (FBN: 0077535)
**Maria E. Bryant** (FBN: 0055332)
The Haba Law Firm, P.A.
1220 Commerce Park Dr., Ste. 207
Longwood, FL 32779
T: (844) 422-2529
E-mail: lisahaba@habalaw.com
E-mail: mariabryant@habalaw.com

**Shannon Snedaker (**FBN: 028042)
**Benjamin Jones** (FBN: 0044285)
Snedaker Law Firm
142 W Lakeview Ave #2040
Lake Mary, FL 32746
T: (407) 553-3529
E-mail: shannon@snedakerlaw.com
E-mail: benjamin@snedakerlaw.com

*Attorneys for Plaintiff*